*Pinnacle Group, LLC, et al. v. Victoria Kelly*, No. 1232, Sept. Term, 2016
Opinion by Leahy, J.

## HEADNOTES

**Employment Law > Maryland Wage Payment and Collection Law > Bona Fide Dispute**

In determining whether a bona fide dispute exists, a court considers "whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay" the withheld wages. *Admiral Mort., Inc. v. Cooper*, 357 Md. 533, 543 (2000).

**Employment Law > Maryland Wage Payment and Collection Law > Bona Fide Dispute**

A person or entity doing business in Maryland must be aware of the requirements affecting a Maryland business enterprise, including whether state and federal laws apply.

**Employment Law > Maryland Wage Payment and Collection Law > Bona Fide Dispute**

Appellants avail themselves of the benefits of operating their business in this jurisdiction, and along with that benefit, comes the responsibility to proactively conform to the governing employment law.

**Employment Law > Determination of Employer > Economic Reality Test**

Critical to the determination of whether an individual is an employer is whether the individual has the right "to control and direct the employee in the performance of the work and in the manner in which the work is to be done."

**Employment Law > Determination of Employer > Economic Reality Test**

The factors are "not to be applied mechanistically, and their general purpose must be understood as ultimately assigning *responsibility* under the law."

**Employment Law > Maryland Wage Payment and Collection Law > Award of Attorney's Fees**

In MWPCL cases, the Court of Appeals has approved the lodestar method, considered in light of the *Johnson v. Georgia Highway Express* factors, as the presumptively appropriate method for determining whether to award attorneys' fees. Courts should liberally exercise their discretion in favor of an award "unless the circumstances of the particular case indicate some good reason why a fee award is inappropriate in that case."

**Employment Law > Maryland Wage Payment and Collection Law > Award of Attorney's Fees**

A trial court must clearly articulate the factors and reasoning used to calculate the overall figure so that an appellate court can adequately discern the soundness of the trial court's conclusion.

**Employment Law > Maryland Wage Payment and Collection Law > Award of Attorney's Fees**

Although we review for abuse of discretion, the trial court must explain its reasoning for its determinations so that we can ascertain the validity of its decision on review.

**Contracts > Contract Interpretation**

Courts should refrain from considering outside evidence of prior statements or understandings when interpreting a contract that contains an integration clause because the clause indicates that the contract is the complete iteration of the parties' agreement.

Circuit Court for Wicomico County
Case No. C13-0953

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1232

September Term, 2016

PINNACLE GROUP, LLC, *et al.*

v.

VICTORIA KELLY

Meredith,
Leahy,
Salmon, James P.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Leahy, J.

Filed: February 1, 2018

The underlying attorneys' fees litigation springs from the lawsuit filed in June 2013 by Victoria Kelly ("Appellee" "Ms. Kelly"), a home-health employee, in the Circuit Court for Wicomico County against her employer, Pinnacle Group, LLC ("Pinnacle"), and its sole owner, Anthony D'Antonio (collectively, "Appellants"). Ms. Kelly sued to recover, *inter alia*, unpaid overtime wages, treble damages, and attorneys' fees under the Maryland Wage Payment & Collection Law, Md. Code (2008 Repl. Vol., 2012 Supp.), Labor & Employment Article ("LE"), §§ 3–501 *et seq.* ("MWPCL") and the Maryland Wage & Hour Law, LE §§ 3–401 *et seq.* ("MWHL").[1] After a series of settlement negotiations, litigation in two state trial courts, and a decision from this Court applying a Court of Appeals' ruling on the scope of the MWPCL, the parties settled Ms. Kelly's claim for $15,500. She then petitioned the circuit court for $146,987.66 in attorneys' fees and $2,851.40 in costs. After the circuit court awarded $49,250.00 in fees against Appellants, they appealed to this Court. Ms. Kelly also filed a cross-appeal, contesting the court's reduction of her claimed attorneys' fees. We have rephrased and consolidated the ten issues presented by the parties into the following six:[2]

---

[1] Citation to the 2012 Supplement reflects the statutes at the time the complaint was filed. The current statutes are codified without change in the 2016 Replacement volume, at Maryland Code (2016 Repl. Vol.), LE, §§ 3–401 *et seq.* and §§ 3–501 *et seq.*

[2] Appellants phrased their questions presented as follows:

I. "Did the trial court err in finding the settlement agreement entered into by Ms. Kelly and Appellants did not release Appellants from any and all claims made by Ms. Kelly, therefore precluding Ms. Kelly from seeking an award of attorney's fees against Appellants?"

II. "Did the trial court err in finding Ms. Kelly was not barred from seeking an award

Continued . . .

of attorney's fees and costs as *res judicata* because of Ms. Kelly's dismissal of her suit against Appellants in the District Court for Wicomico County?"

III.     "Did the trial court err, as a matter of law, in awarding Ms. Kelly attorney's fees, despite the trial court never having made the predicate finding that Appellants had violated the MWPCL?"

IV.     "Did the trial court err, as a matter of law, in finding Ms. Kelly was not paid overtime wages because of a *bona fide* dispute?"

V.     "Did the trial court err, as a matter of law, in finding that Mr. D'Antonio constituted Ms. Kelly's employer and, therefore, is individually liable to Ms. Kelly under the MWPCL?"

VI.     "Did the trial court err in overlooking Ms. Kelly's failure to establish the fees were necessary?"

VII.     "*Assuming arguendo* the trial court did not err, as a matter of law, in awarding Ms. Kelly attorney's fees under the MWPCL, and further assuming Ms. Kelly established the fees were necessary, did the trial court abuse its discretion in denying Ms. Kelly's request for an award of attorney's fees and costs under the MWHL and granting Ms. Kelly an award of attorney's fees under the MWPCL in the amount of $49,250.00?"

Ms. Kelly, in her cross-appeal, presented three questions for our review:

I.     "Whether the circuit court correctly determined that Ms. Kelly was entitled to reasonable attorneys' fees following favorable rulings in this Court on her entitlement to overtime wages under the WPCL and in the circuit court on whether Appellants' ignorance of the existence of Maryland law constituted a bona fide dispute, and a favorable settlement expressly providing that Ms. Kelly would petition for an award of attorneys' fees?"

II.     "Whether the circuit court correctly found that D'Antonio, who solely owns Pinnacle and caused it to underpay Ms. Kelly through his total operational control of the business, was Ms. Kelly's employer and therefore jointly and severally liable for attorneys' fees?"

III.     "Whether the court improperly determined the amount of fees to be awarded when it failed to apply the governing legal standard in determining the reasonableness of

1. Did the Settlement Agreement preclude Ms. Kelly from seeking an award of attorneys' fees against Appellants?

2. Did *res judicata* bar Ms. Kelly's petition for attorneys' fees and costs associated with her MWHL claim, given the dismissal of Ms. Kelly's suit on that claim in district court?

3. Did the circuit court err in awarding attorneys' fees associated with her MWHL claim without making the predicate finding that Appellants violated the MWPCL?

4. Did the circuit court err in finding there was no bona fide dispute in Appellants' failure to pay Ms. Kelly overtime wages?

5. Did Mr. D'Antonio qualify as Ms. Kelly's employer under the economic reality test so that he could be held jointly and severally liable for attorneys' fees?

6. Using the lodestar analysis, did the circuit court correctly determine that Ms. Kelly was entitled to attorneys' fees and adequately calculate the fee award?

On the first issue, we hold that the circuit court did not err in finding that the plain language of the parties' settlement agreement did not preclude Ms. Kelly from petitioning for attorneys' fees. Because the circuit court did not award any attorneys' fees for Ms. Kelly's MWHL claim or the district court action, we need not decide whether *res judicata* barred attorneys' fees for those claims. In regard to the third and fourth issues on appeal, the record reflects that the circuit court already made the predicate finding that there was no bona fide dispute when it granted partial summary judgment on July 24, 2015, and

---

*Continued . . .*

the fees requested, instead incorrectly applying a 'proportionality' analysis based on the 'relatively modest' amount in controversy rather than the correct 'degree of success' analysis, erroneously applied a billing notice requirement, and failed to award fees for work equally necessary to Ms. Kelly's success and costs?"

3

determined, properly, that Appellants withheld Ms. Kelly's earned wages without a good faith basis for doing so. We also conclude, in regard to the fifth issue raised, that the trial court applied the economic reality test properly in determining whether Mr. D'Antonio was Ms. Kelly's employer and in deciding that he is jointly and severally liable for any judgment against Appellants. Finally, while the circuit court did not abuse its discretion in deciding to award fees, we hold that the court erred in failing to satisfactorily articulate its reasoning for the amount awarded. Thus, we affirm all of the trial court's decisions that are properly before us on appeal, except that we remand for further proceedings on the amount of attorneys' fees awarded for the reasons explained below.

## BACKGROUND

### A. Ms. Kelly's Employment

Ms. Kelly worked as a companion care employee, a/k/a home healthcare worker, for LifeMatters, an entity providing care for senior citizens and the disabled on Maryland's Eastern Shore and in Sussex County, Delaware. LifeMatters is owned by Pinnacle Group, an umbrella company that has its principal place of business in Salisbury, Maryland. Mr. D'Antonio wholly owns Pinnacle Group.

For approximately eighteen months preceding Ms. Kelly's suit, her work schedule consistently pendulated between 97 hours of work one week and 88 hours the following week. For those weekly hours worked in excess of 40 hours during this period, Appellants did not pay Ms. Kelly an overtime rate of "time and a half" but instead paid only her standard hourly wage.

On at least two occasions, Ms. Kelly inquired about overtime pay and was informed

4

that Pinnacle's policy was that it did not pay overtime. Mr. D'Antonio later claimed in his deposition that he believed Ms. Kelly was exempt from overtime regulations given the application of federal law exempting home companion workers,[3] and he did not consider that Ms. Kelly may be entitled to overtime wages under Maryland law because of his belief that federal law superseded Maryland's law.

**B. Ms. Kelly Sues to Recover Wages**

After learning that she was, in fact, entitled to overtime wages under Maryland law, Ms. Kelly commenced the underlying suit in the Circuit Court for Wicomico County on June 10, 2013, claiming violations of the MWHL and the MWPCL "stemming from [Appellants'] willful failure to pay her all earned wages, including overtime wages[.]"[4] Ms. Kelly sought return of the wages and overtime owed, plus treble damages. She also asserted a claim of quantum meruit, seeking restitution or appropriate disgorgement of Pinnacle's profits. Finally, she requested an award of attorneys' fees and costs.

After receiving notice of Ms. Kelly's suit, Mr. D'Antonio contacted counsel who informed him that federal law did not preempt Ms. Kelly, and other companion care

---

[3] *See* Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (2012). The Act requires that, for each hour worked in excess of 40 hours per week, employees are paid at least one and one-half times their regular rate; however, § 213(a)(15) exempts from "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves[.]"

[4] At the time that Ms. Kelly filed her suit, this Court had held that the MWPCL only provided a right of action to an employee whose employer failed to pay on a set schedule or failed to pay in advance when payday was on a non-workday. *Marshall v. Safeway, Inc.*, 210 Md. App. 545, 568-69 (2013). The Court of Appeals rejected that interpretation in 2014, ruling that employees have a cause of action when the employer does not pay wages lawfully due. *Marshall v. Safeway, Inc.*, 437 Md. 542, 561-62 (2014).

workers employed by his companies, from Maryland's overtime wage requirements. Nevertheless, Appellants filed their joint Answer on August 9, 2013, in which they asserted a general denial to all of Ms. Kelly's allegations along with the affirmative defenses of payment and statute of limitations.

Roughly six weeks later, on September 26, 2013, the parties met in Baltimore for a settlement conference. At the meeting, Appellants agreed to furnish certain documents, including Pinnacle's financial statements and tax returns. Ms. Kelly's counsel sent a letter to Appellants on October 9, informing them that Ms. Kelly had not yet received the documents (which were also responsive to Ms. Kelly's discovery requests) and informing Appellants that Ms. Kelly's counsel now represented Rhonda Russell, another LifeMatters employee who also did not receive overtime compensation.

On October 16, 2013, Appellants' counsel unilaterally tendered two checks, enclosed in a letter to counsel for Ms. Kelly and Ms. Russell. The letter stated, "I also enclose a check from Mr. D'Antonio to Ms. Kelly, in the amount of $15,067.21, which is the amount of overtime Mr. D'Antonio has determined to have been uncompensated." The letter also contained the explanation that "[t]he gross amount of overtime compensation due . . . would be . . . $21,413.25 in the case of Ms. Kelly. I have enclosed a statement detailing the withholdings taken from both checks." Included along with the checks was a draft stipulation to dismiss the claims with prejudice. Ms. Russell accepted the check, but counsel returned Ms. Kelly's check, asserting that payment did not make her whole and that damages and attorneys' fees remained viable claims. On November 7, 2013, after receiving verification from Appellants' counsel that accepting the check would not release

6

her claims, Ms. Kelly accepted her check. Appellants then filed an Amended Answer on the same day, in which they added the affirmative defense of accord and satisfaction.

## C. Attorneys' Fees

Still not in receipt of the requested financial documents, on November 8, Ms. Kelly's counsel sent another letter, stating that "[i]t is necessary to know the health and profitability of our clients' employers, in order to assure that damages are awarded in [sic] amount that actually would have some deterrent effect." On the same day, Appellants filed discovery requests that included an interrogatory seeking information regarding the fee agreement between Ms. Kelly and her counsel. Ms. Kelly's counsel objected because "it seeks information that is irrelevant . . . at this stage[.]"

On December 17, 2013, Ms. Kelly's attorneys were set to begin depositions when they transmitted a "time-limited settlement demand" on her behalf because they were at a tipping point of putting "significant attorney time" into the litigation and noted that a "trial will increase the amount of fees exponentially." After not receiving a response, Ms. Kelly amended her complaint to include Ms. Russell's claims. Subsequently, Ms. Kelly's attorneys deposed several parties, including Mr. D'Antonio's accountant, Sherry Sadler, who testified that while learning payroll, she was informed by an outside accountant that home healthcare workers were exempt from overtime requirements.

On January 2, 2014, Appellants' counsel requested the hourly rates, total hours, and total billings of Ms. Kelly's attorneys with whom they had been dealing in exchange for not filing a motion compelling production of those documents. One of Ms. Kelly's attorneys responded that her rate is $240 an hour, that she had spent roughly 69.25 hours,

and that she had yet to bill; further, she responded that the other attorney's rate was $250 an hour, but she could only approximate his hours because he was out of the country.

### D. Prior Appeal and State District Court Action

On January 16, 2014, Appellants moved for summary judgment in the circuit court, arguing that the MWPCL did not concern the amount of wages payable, but rather, the duty to pay wages due on a regular basis. They claimed that Ms. Kelly failed to state a claim upon which relief could be granted because the MWPCL did not provide for the recovery of unpaid overtime wages. Appellants further argued that Ms. Kelly could not recover damages under LE § 3–507.2(b), *infra*, which allows for the recovery of up to three times the wages owed if the wages were not withheld as a result of a bona fide dispute. They claimed that such a dispute did exist since they had a good faith basis for withholding Ms. Kelly's overtime wages—their belief that federal law, which exempted home healthcare workers from overtime pay requirements, preempted Maryland law, which did not exempt those workers. Mr. D'Antonio "honestly never looked into" whether that belief was correct; instead, he simply relied on that interpretation from "someone else". Finally, Appellants claimed that Ms. Kelly's MWHL claim was satisfied since they paid her in full for all unpaid overtime wages.

Ms. Kelly filed her motion for partial summary judgment the next day, arguing that Appellants' ignorance of the law did not create a bona fide dispute. She claimed that judicial recognition of "willful ignorance" as constituting a bona fide dispute would "incentivize employers to wear blinders rather than comply with their legal obligations."

On February 26, 2014, the circuit court granted summary judgment to Appellants

8

on the MWPCL claim. The circuit court found that, under the Court of Appeals' holding in *Friolo v. Frankel*, 373 Md. 501, 513 (2003), Ms. Kelly's claim was not viable because the MWPCL only "concerns the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." As a result of the dismissal of her MWPCL claim, the circuit court dismissed her MWHL claim because it was "at most, $4,000.00 at issue[]" and thus did not satisfy the amount in controversy required for the circuit court's jurisdiction.[5] The court then denied Ms. Kelly's motion for partial summary judgment.

On February 28, 2014, Ms. Kelly filed suit in the District Court of Maryland for Wicomico County on the MWHL claim that was dismissed by the circuit court. (Civil Action No. 020300015252014). Ms. Kelly alleged that the check she received in October 2013 did not fully compensate her for her unpaid regular and overtime wages and that Appellants still owed her $2,500.00 in unpaid wages and $1,700.00 in interest plus attorneys' fees and costs. Ms. Kelly contended that these unpaid wages included "pre and post scheduled shift work and compensable travel time." In addition, Ms. Kelly alleged that Appellants breached their employment contract, resulting in economic injury, and again alleged quantum meruit.

On the same day that she filed suit in district court, Ms. Kelly challenged the circuit

---

[5] In *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646 (2014), the Court of Appeals clarified the difference between—and interrelatedness of—the MWPCL and MWHL: "The [M]WHL aims to protect Maryland workers by providing a minimum wage standard. The [M]WPCL requires an employer to pay its employees regularly while employed, and in full at the termination of employment. Read together, these statutes allow employees to recover unlawfully withheld wages[.]" *Id.* at 653.

9

court's decision on the MWPCL in an appeal to this Court.[6]  The same MWPCL issues were pending in the Court of Appeals, which then decided *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646 (2014) and *Marshall v. Safeway Inc.*, 437 Md. 542 (2014).  In *Marshall*, the Court of Appeals held that the MWPCL provides a cause of action for wrongfully withheld wages, including overtime, 437 Md. at 560, and subsequently, in *Peters*, the Court reiterated, "Without a doubt, [Plaintiff] has a right to bring a private cause of action under the WPCL to recover any unlawfully withheld overtime wages."  439 Md. at 654-55.  Consistent with those decisions, we held in *Kelly v. Pinnacle Group, LLC*, No. 2641, September Term 2013, slip op. at 10-12 (filed Jan. 26, 2015) (unreported), that Ms. Kelly had a cause of action under the MWPCL and reversed the circuit court's grant of summary judgment to Appellants.

We did not decide, however, whether a bona fide dispute existed for Appellants' failure to pay Ms. Kelly overtime wages.  The circuit court had dismissed Ms. Kelly's motion for partial summary judgment as moot, and therefore, did not make any factual findings.  Because we could not review the issue of whether a bona fide dispute existed, we allowed Ms. Kelly's claim to proceed, giving instructions to the circuit court that the determination of whether a dispute existed "may require specific factual findings" and that if the factfinder found there was no dispute, the parties could proceed to damages.

---

[6] *Kelly v. Pinnacle Group, LLC*, No. 2641, September Term 2013 (filed Jan. 26, 2015) (unreported).  Ms. Kelly later moved to stay the district court suit because of her pending appeal, which the district court granted.

**E. Partial Summary Judgment, Settlement, and Petition for Fees and Costs**

On remand in the circuit court, Ms. Kelly renewed her motion for partial summary judgment, in which she alleged that Appellants' failure to pay her overtime wages was not the result of a bona fide dispute. On June 4, 2015, the court heard arguments as to whether there was a bona fide dispute and held the matter *sub curia*. In a written opinion dated July 24, 2015, the circuit court found that, in light of *Peters*, Appellants did not have a "good faith basis" for refusing to compensate Ms. Kelly for overtime wages. Instead, the circuit court found that Appellants did not exercise due diligence as they failed to consult counsel or research whether Maryland law would still apply in light of conflicting federal law. The court stated the following:

> This is not a case where [Appellants] exercised due diligence to ascertain the obligations imposed by Maryland law. To the contrary, [Appellants] neither researched, nor sought legal advice, as to Maryland law governing overtime wages for [Ms. Kelly] or her co-workers. Nor did [Appellants] research, or seek legal advice, as to the relationship between State and Federal law on the issue of payment of overtime wages to home healthcare workers. Rather, [Appellants], without making any reasonable effort to know and abide by Maryland law, simply denied the wage claim of [Ms. Kelly]. . . . [Appellants] chose deliberate ignorance over due diligence. Given those facts, this Court cannot find a good faith basis for denying the claim for overtime wages.

The court also noted Mr. D'Antonio's deposition testimony, in which he stated that he "honestly never looked into it." As a result, the court concluded, deliberate ignorance of Maryland law could not constitute a bona fide dispute and granted Ms. Kelly's motion for partial summary judgment.

The circuit court's ruling appears to have been the impetus for renewed settlement negotiations. The parties informed the court on November 19, 2015 that they settled Ms.

11

Kelly's claims, and on November 23, 2015, the court removed the pre-trial conference and trial dates. In the preamble of the Settlement Agreement, the parties noted that Ms. Kelly's suit in the circuit court sought unpaid wages and damages resulting from violations of the MWPCL and MWHL and that they agreed to settle that suit. Ms. Kelly received $15,500, in addition to the $15,067.21 paid in October 2013. Out of the $15,500, $2,200 was for wages while $13,300 was for non-wage damages. The parties noted several times throughout the Agreement that Ms. Kelly maintained her right to petition the court for attorneys' fees and costs. Ms. Kelly exercised that right two months later, on January 22, 2016, by filing her Petition for Fees and Costs. Her petition, inclusive of both her MWPCL and MWHL claims, requested attorneys' fees for $146,987.66, representing a deduction from fees incurred in the amount of $194,142.85, and also sought costs of $2,851.40. This request included the fees and costs for her protective action in the district court as well as her appeal on the scope of the MWPCL. The circuit court issued its decision on July 21, 2016. Since the parties settled prior to the court's consideration of whether Appellants violated the MWHL, the court found that it could only award attorneys' fees pursuant to the MWPCL. As a result, the court found that Ms. Kelly was entitled to $49,250.00 in attorneys' fees under the MWPCL and also found that Mr. D'Antonio was Ms. Kelly's employer for individual liability purposes.

Appellants filed a timely appeal to this Court on August 19, 2016. One week later, Ms. Kelly noted her cross-appeal.

DISCUSSION

## I.

## THE SETTLEMENT AGREEMENT

Appellants' first contention on appeal is that the Settlement Agreement prohibited Ms. Kelly from seeking attorneys' fees. Appellants acknowledge that Section 2.1 of the Agreement allows Ms. Kelly to petition the court for attorneys' fees and costs but argue that Section 4 releases them "from those claims arising out of, or in any way relating or pertaining to, wages claimed to be or actually owed for work performed." They claim that Ms. Kelly cannot get attorneys' fees because LE § 3-507.2(b) first requires a finding by the court that an employer withheld wages in violation of the statute and that cannot occur because the terms of the Agreement denied all liability.

Ms. Kelly responds that no such waiver occurred because the Agreement's language in Sections 2.1, 2.4, and 2.5 is clear and unambiguous in preserving her right to petition for attorneys' fees, and thus, we must presume the parties meant what they expressed. Ms. Kelly maintains that Section 4 is a general waiver that does not limit her ability to seek attorneys' fees and notes that Appellants further assented to her right to petition when they submitted a letter to the court agreeing to submit the question of attorneys' fees and costs to the court.

Settlement agreements are subject to the same general rules of construction that apply to other contracts. *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 421 (2016). The basic precept of contract interpretation is to contemplate and effectuate the parties' intentions. *Id.* (citation omitted). We will not displace an objective reading of

the contract with one party's subjective understanding. *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341 (1999) (citations omitted). We construe the contract in its entirety, *Maslow v. Vanguri*, 168 Md. App. 298, 318 (2006) (citation omitted), but when a general provision seemingly conflicts with a specific provision, we will give effect to the specific provision. *Heist v. Eastern Sav. Bank, FSB*, 165 Md. App. 144, 151 (2005) (citation omitted).

The Agreement contains three provisions, all located in Section 2, that specifically address Ms. Kelly's ability to petition the Court for attorneys' fees:

> 2.1    In consideration for the mutual promises contained in this Agreement, Defendants agree to pay Plaintiff a total of $15,500.00 to settle all claims alleged in the Lawsuit, *except Plaintiff's claims for attorneys' fees and costs.*
>
> **\* \* \***
>
> 2.4    *The Parties have agreed that Plaintiff will petition the Court for an award of attorneys' fees and costs*[.]
>
> 2.5    Plaintiff accepts the Settlement Payments made and to be made hereunder *and the right to petition the court for fees and costs*, provided herein, as consideration in full and complete satisfaction and release of claims alleged in the Lawsuit and/or covered in this Agreement.

(Emphasis added).

The parties also stipulated to one provision that provides a general waiver of liability and a release of claims. That section, Section 4.1, states the following:

> Plaintiff . . . fully, finally, and forever, settles, waives, releases, and discharges Defendants . . . from those claims arising out of, or in any way relating or pertaining to, wages claimed to be or actually owed for work performed for Defendants that Plaintiff had, now has, or may have from the beginning of time up through the effective date of this Agreement, including, but not limited to, claims under the Federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), the MWHL, and the MWPCL.

14

Based on a plain reading of the Agreement, the only interpretation that effects the parties' intent without rendering the specific provisions surplusage is that the parties agreed Ms. Kelly would retain the right to petition for attorneys' fees and costs. Such a construction was not only contemplated by the parties, as evidenced by the multiple sections, but also aligns with the principle of *ejusdem generis*. That canon provides that, where specific words are followed by a general term, the general term will be read narrowly because of the specific items enumerated. *See Ejusdem Generis*, Black's Law Dictionary (10th ed. 2014). Here, the provisions in Section 2 of the Agreement state unambiguously that the right of Ms. Kelly to petition for costs and fees is not waived, and those sections therefore have priority over the general language found in Section 4.1. *See Heist*, 165 Md. App. at 151.

We conclude that Ms. Kelly did not waive her right to petition for costs and fees, and the general waiver in Section 4.1 must be read subordinate to those preceding sections that permitted her to do so. Section 4.1 neither states expressly nor contemplates implicitly a subversion of the objective reading of the Agreement that allows Ms. Kelly to seek attorneys' fees and costs. A contrary interpretation would render superfluous the specific sections and would clearly contravene the parties' intent. We presume that the parties meant what they agreed to and will enforce the Agreement as such. *See Ashton*, 354 Md. at 340-41.

## II.

### *RES JUDICATA*

Appellants next argue that the doctrine of *res judicata* precludes Ms. Kelly from receiving attorneys' fees for her MWHL claim in district court because she voluntarily dismissed, with prejudice, that suit three days before the hearing in circuit court on her Petition for Attorneys' Fees. Appellants assert that this dismissal constituted a final judgment on Ms. Kelly's claim in the district court and therefore, precluded her from re-litigating any claim that was or could have been asserted in the district court proceeding—including her claim for attorneys' fees in that suit.

Ms. Kelly refutes Appellants' *res judicata* argument, contending that the doctrine does not apply to bar her claim for attorneys' fees from her district court suit because she filed that suit to protect her MWHL claim in the event that her appeal on the MWPCL claim failed. Ms. Kelly further notes that she only dismissed that district court action after she succeeded on her appeal, obtained summary judgment on the bona fide dispute issue, and settled the merits of her case, "explicitly reserv[ing] the issues of attorneys' fees."

Appellants' argument is cut short—full stop—by the fact that the circuit court did not award any attorneys' fees for the MWHL claim or the district court action. In the court's July 21, 2016 opinion and order, from which Appellants filed the instant appeal, the court explained as follows:

> As discussed above, this Court has made a finding that Defendants withheld the wages of Plaintiff in violation of the [MWPCL], which triggers the granting of an award in favor of Plaintiff under the [MWPCL, LE § 3-507.2(b)]. However, the Wages and Hour Law provides that, 'if a court determines that an employee is entitled to recovery, under the statute, the

16

court shall award to the employee reasonable counsel fees and other costs.' [MWHL, LE § 3-427(d)(1)(iii)]. **This case is unique in that it settled before the Court had an opportunity to make a finding that Plaintiff was entitled to recovery under the [MWHL]. Therefore, the Court has made the requisite finding required under the [MWPCL], which gives the Court discretion in determining whether counsel fees are to be awarded. However, the Court has not made the requisite finding to grant relief sought under the [MWHL**].

(Emphasis added). Apparently recognizing, among other things, that the action filed by Ms. Kelly in the district court in 2014 concerned only her MWHL claim, the court below did not include attorneys' fees for that action in its award.

> After careful consideration of all of the facts and evidence provided, the Court finds that Plaintiff's counsel shall be compensated for all fees incurred by all attorneys during the period of **February 22, 2013 through October 25, 2013**, during which time, the initial client intake interview was completed and the first settlement check was tendered by the Defendants. This totaled 52.3 hours. . . . The Court further finds that the Plaintiff shall **also be compensated for additional settlement efforts**, which totaled 33.4 hours **and appellate services provided**, which totaled 111.3 hours.

(Emphasis added). Appellants' *res judicata* argument is a *non sequitur* to the foregoing fee award. Indeed, the fees ultimately awarded included attorney hours incurred before filing either complaint, as well as time spent on appellate services and settlement efforts related to the circuit court action, which, as the court explained, decided only the MWPCL claim. Accordingly, because the circuit court determined that it would not award counsel fees under the MWHL and because it did not award any attorneys' fees for the district court action, we need not examine whether Ms. Kelly's dismissal of the district court action barred the attorneys' fees awarded in this case.

17

## III.

## PREDICATE FINDING

Appellants next contend that the circuit court was required to make the "predicate finding" that they had violated the MWPCL. Appellants continue that, because the circuit court failed to make the requisite finding that Ms. Kelly was entitled to recovery under the MWPCL, the trial court erred in awarding attorneys' fees to Ms. Kelly under the MWPCL.

The decision on the merits of Ms. Kelly's MWPCL claim was made on July 23, 2015. In its written opinion of that date, the circuit court found that "the undisputed material facts establish that (1) [Ms. Kelly] was entitled to overtime wages, (2) [Appellants] deliberately failed to pay those wages, (3) [Appellants] lacked a good faith basis for denying the wage claims of [Ms. Kelly], and (4) there was no bona fide dispute between the parties as to whether the overtime wages were due and owing." The court made the requisite finding under LE § 3-507.2 for purposes of a violation of LE § 3-502 or LE § 3-505,[7] and concluded that "there was no bona fide dispute between the parties, and [Ms. Kelly] is entitled to partial summary judgment as a matter of law."

In the circuit court's July 21, 2016 opinion and order on the Petition for Attorneys' fees, the court reiterated that the only issue it was deciding was the award of attorneys' fees

---

[7] In *Peters*, the Court of Appeals said, "The [M]WPCL requires an employer to pay its employees regularly while employed[,]" and that the MWPCL's "principal purpose was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." 439 Md. at 653 (citing *Battaglia v. Clinical Perfusionists, Inc.,* 338 Md. 352, 364 (1995)). The Court explained that employees can use the MWPCL to recover overtime wages. *Id.* at 653-54. *See also Marshall*, 437 Md. at 559-62 (providing an historical overview of the MWPCL's development to provide a private cause of action).

18

under the MWPCL based on the fact that "the Court has made the requisite finding required under the [MWPCL], which gives the Court discretion in determining whether counsel fees are to be awarded." We conclude that Appellants' contention that the circuit court failed to make the predicate finding to support the award of attorneys' fees under the MWPCL is without merit.

## IV.

## BONA FIDE DISPUTE

After asserting that the circuit court failed to make the predicate finding that there was no bona fide dispute under LE § 3-507.2(b), Appellants, alternatively, cite to the circuit court's July 23, 2015 decision and contend that the court ignored evidence and misinterpreted case law in determining that the failure to pay overtime wages did not result from a bona fide dispute. Ms. Kelly maintains, however, that the issue is precluded because it was resolved when Appellants "'agreed to settle the Lawsuit on the terms and conditions set forth in'" the Agreement. The parties accepted the circuit court's ruling by stating in the Agreement that negotiations were based on "'the Court's prior rulings[.]'" Ms. Kelly argues that, notwithstanding preclusion of this issue, Appellants' argument would still fail because the circuit court found that Appellants acted in deliberate ignorance of the law without a genuine basis for doing so, and such a basis is required to constitute a bona fide dispute. Ms. Kelly concludes that upon making this finding, the circuit court appropriately exercised its discretion that Ms. Kelly is entitled to attorneys' fees.

### A. Incorporation into the Settlement Agreement

We first address Ms. Kelly's argument that the terms of the Settlement Agreement

19

prevent Appellants from challenging the circuit court's grant of partial summary judgment. Appellants, in their reply, declare that the Agreement merely highlights that the parties relied on all of the prior proceedings when negotiating, and therefore, they are not precluded from challenging the circuit court's decision.

To determine whether the court's decision is part of the Agreement, we must determine whether the Agreement incorporated that decision by reference. As explained in Section I, *supra*, our goal in interpreting a contract is to understand and effectuate the intention of the parties. *Kasten Constr. Co. v. Rod Enterprises, Inc.*, 268 Md. 318, 328 (1973). One way to accomplish this is to interpret the contract's language as a reasonable person would have interpreted the contract at the time of its effectuation. *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985).

Maryland courts generally recognize the doctrine of integration. *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 126 (2011). Courts should refrain from considering outside evidence of prior statements or understandings when interpreting a contract that contains an integration clause because the clause indicates that the contract is the complete iteration of the parties' agreement. *See id.* (citations omitted). Under the integration doctrine, then, when an agreement purports to be the final agreement between the parties, only those terms control and preclude consideration of extrinsic evidence.

Incorporation by reference is a method of contract drafting such that where a subsequent document references a previous document, it incorporates that previous document into the subsequent. "[I]t simply means that the earlier document is made a part

20

of the second document, as if the earlier document were fully set forth therein." *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 292 (1996) (citations omitted). "'It is settled that where a writing refers to another document that other document, or so much of it as is referred to, is to be interpreted as part of the writing.'" *Wells v. Chevy Chase Bank, F.S.B.*, 377 Md. 197, 229 (2003) (quoting *Ray v. William G. Eurice & Bros., Inc.*, 201 Md. 115, 128 (1952)).

Section 5.3 of the Agreement states, "<u>Entire Understanding</u>. This Agreement constitutes the entire understanding and agreement between the Parties and **all prior and contemporaneous negotiations and understandings between the Parties shall be deemed merged into this Agreement.**" (Emphasis added). This is an integration clause that precludes a factfinder from considering provisions not in the Agreement. We therefore consider only what the language of the document says.

The issue, then, is whether the Agreement incorporated the circuit court's grant of Ms. Kelly's motion for partial summary judgment that a bona fide dispute did not exist. To support her contention that the decision is incorporated, Ms. Kelly points to Section 1.2 of the Agreement, which states in part, "Relying on their fact investigations, discovery responses, legal analyses, and the Court's prior rulings, the Parties have engaged in significant arm's length settlement negotiations." Although this sentence hints at the circuit court's finding that there was no bona fide dispute, it simply informs us that the parties may have considered it when formulating strategy for negotiations. Such language is insufficient to incorporate that finding into the Agreement, especially since "all prior and contemporaneous negotiations and understandings between the Parties" were "merged into

21

this Agreement."

In light of this clause, a reasonable person would not read such indirect and broad language as incorporating the circuit court's specific ruling into the Agreement. *See Hartford*, 109 Md. App. at 291-92. Section 5.3 of the Agreement clearly indicates an intent to integrate all previous negotiations. Ms. Kelly's interpretation of Section 1.2 would effectively interpret the Agreement "in a manner in which a meaningful part of the [A]greement is disregarded." *See id.* at 293. We cannot contravene the "clear and unambiguous language" so as to interpret the Agreement based simply on what Ms. Kelly may have "thought the [A]greement meant or intended it to mean." *See id.* at 291 (quoting *Bd. of Trs. of State Colls. v. Sherman*, 280 Md. 373, 380 (1977)). Therefore, as the circuit court's judgment was not incorporated into the Agreement, we hold that the Agreement's integration clause does not preclude Appellants from challenging that judgment on appeal.

## B. The Grant of Partial Summary Judgment

Turning to the merits of Appellants' fourth issue, Appellants suggest that the onus was on Ms. Kelly to persuade her employer on the requirements of the overtime wage laws because "[i]f [she] sought to tax her employer with penalties and costs for having resisted her legitimate claims in a manner that is not 'bona fide,' then she should have informed Appellants of those claims sufficiently to expose to a reasoning mind, actuated by good will, the fallacy of resistance." Thus, "because Ms. Kelly never gave Appellants the chance to correct what she had learned was a mistake, she should not be awarded attorney's fees and costs on the theory Appellants had willfully adhered to a position they knew to be wrong." Appellants point to dicta in *Peters* that "[a]n incorrect legal belief, such as federal

preemption, may form the basis of a legitimate bona fide dispute." 439 Md. at 659 n.12.

Ms. Kelly focuses on the circuit court's reasoning for granting her partial summary judgment. Ms. Kelly reiterates that Appellants conducted an "ostrich-like approach" to the performance of their legal obligations and presses that the circuit court's decision was correct as a matter of law because "deliberate ignorance over due diligence" cannot constitute a bona fide dispute.

A court must grant a motion for summary judgment in favor of the moving party when there is no genuine issue of material fact and the court determines that the party is entitled to judgment as a matter of law. Md. Rule 2-501(f). "In determining whether a fact is material," the Court of Appeals "ha[s] said that 'a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment.'" *Barclay v. Briscoe*, 427 Md. 270, 281 (2012) (quoting *O'Connor v. Balt. Cty.*, 382 Md. 102, 111 (2004); emphasis in original). Whether summary judgment was proper is a question of law, which we review *de novo*. *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 108 (2011) (citation omitted). In doing so, we construe the record in a light most favorable to the non-moving party and thereby interpret any inferences drawn from the record against the moving party. *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 114 (2004).

If "a court finds that an employer withheld the wage of an employee in violation of [the MWPCL] and not as a result of a bona fide dispute," it may order an award "not exceeding 3 times the wage, and reasonable counsel fees and costs." LE § 3-507.2(b). The Court of Appeals in *Peters* reiterated its definition of a bona fide dispute: "'a legitimate

23

dispute over the validity of the claim or the amount that is owing []' where the employer has a good faith basis for refusing an employee's claim for unpaid wages." 439 Md. 646, 657 (2014) (citing *Admiral Mort., Inc. v. Cooper*, 357 Md. 533, 543 (2000)). In determining whether a bona fide dispute exists, a court considers "whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay" the withheld wages. *Admiral Mort.*, 357 Md. at 543.

The court's inquiry therefore focuses on "the employer's 'actual, subjective belief that the party's position is objectively and reasonably justified.'" *Peters*, 439 Md. at 657 (quoting *Barufaldi v. Ocean City, Md. Chamber of Commerce, Inc.*, 206 Md. App. 282, 293 (2012) ("*Barufaldi II*")). As such, the employer has the initial burden to produce evidence of a subjective belief purporting to create a bona fide dispute. *Id.* at 658-59. The burden then shifts to the employee to refute the employer's evidence. *Id.* Ultimately, we must decide whether Appellants' mistaken belief that federal law preempted state law, making Ms. Kelly exempt from overtime requirements, constituted a bona fide dispute under the MWPCL. We note that the parties do not contend that the fact that Appellants' had a mistaken belief of the law was a material fact genuinely in dispute.

In their memorandum opposing Ms. Kelly's motion for partial summary judgment, Appellants argued that they acted solely in good faith arising from their "reasonable belief" that federal law preempted Maryland law. For support, Appellants noted that they continued to use the previous owner's Employee Handbook and forms that stated workers were exempt under federal law and were advised by Mr. D'Antonio's accountant, who was

24

informed by an outside accountant while learning payroll that companion care workers were exempt. Appellants stated that they had no reason to question their understanding because, prior to Ms. Kelly, no one had complained of not receiving overtime pay.

In support of her motion for partial summary judgment, Ms. Kelly first noted that ignorance of the law cannot create a bona fide dispute. She claimed that Appellants essentially remained deliberately ignorant by never looking into whether Maryland had an applicable law or whether such a law would apply despite contrary federal law. Further, Mr. D'Antonio admitted that he never investigated whether the Employee Handbook would conform to such a state law. Ms. Kelly then relied on a Supreme Court decision regarding the Fair Debt Collection Practices Act that "an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that [the] conduct violated the law." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 582-83 (2010).

We find *Roy v. County of Lexington, South Carolina*, 141 F.3d 533 (4th Cir. 1998), the decision cited in the dicta of *Peters*, helpful in our analysis. In that case, a county's top officials convened a meeting where the county's labor attorney informed them that they could pay EMS workers under a certain subsection of the FLSA, that they could increase the number of hours required before overtime pay applied, and that they could dock certain hours for meals and sleep from compensable hours. *Id.* at 537. The county then implemented these suggestions into the overtime policy. *Id.* The workers filed suit, and on appeal, the Fourth Circuit considered whether the district court erred in failing to award the EMS workers liquidated damages under the FLSA. *Id.* at 548. The two reasons upon

which the Court upheld the district court's finding of good faith on the part of the county were that it relied on its attorney's counsel, even though that counsel was incorrect, and that it made "ongoing modification of its compensation structure to accommodate changes in the Act." *Id.* at 549.

Returning to the present case, we find that Appellants' reliance on an outside accountant's incorrect advice is easily distinguishable from the county's reliance on its attorney in *Roy*. In that case, the county proactively sought to comply with the FLSA by consulting its labor attorney on changes in employment laws. *Roy*, 141 F.3d at 549. Here, however, Appellants took no action to ensure their policies were legally correct. They did not seek the advice of their counsel—even after Ms. Kelly put her employer on notice by her questions. According to the complaint, on at least two occasions before she filed suit, Ms. Kelly called the office and inquired about overtime and was informed that Pinnacle did not pay overtime. Appellants made no attempt to learn whether Maryland law still applied in light of contrary federal law or if it imposed any duties regarding overtime wages. Instead, Appellants passively accepted an off-the-cuff answer by an outside accountant providing training to a new hire and perpetuated incorrect legal statements by adopting a previous owner's employment policies. At least twice, Ms. Kelly asked Appellants about overtime, yet Appellants said she was exempt even though they "honestly *never looked into it*." (Emphasis added).

*Roy* is also distinguishable because the county in that case actively sought to update its policies to accommodate legal changes; whereas here, Appellants wholly failed to make any effort to determine if Maryland law could affect its business. A person or entity doing

26

business in Maryland must be aware of the requirements affecting a Maryland business enterprise, including whether state and federal laws apply. Furthermore, it is the employer's obligation to remain informed, and an employer cannot rely on aggrieved employees to inform them of the employer's legal responsibilities. Appellants avail themselves of the benefits of operating their business in this jurisdiction, and along with that benefit, comes the responsibility to proactively conform to the governing employment law. *See McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 245 (4th Cir. 2016) (describing that, if an employer's mere assumption could constitute good faith, then no employer would actively try to comply with employment standards); *see also CSR, Ltd. v. Taylor*, 411 Md. 457, 464 (2009) (stating that an entity is subject to Maryland law when it sufficiently takes advantage of the benefits and protections of Maryland law).

Accordingly, we discern no error in the circuit court's decision that there was no bona fide dispute and that Appellants withheld Ms. Kelly's earned wages without a good faith basis for doing so. As the circuit court aptly noted, to decide otherwise would be tantamount to encouraging an employer to "choose ignorance, and forever escape the provisions of the statute designed to foster compliance." We affirm the court's grant of partial summary judgment.

## V.

## MR. D'ANTONIO AS EMPLOYER

Appellants believe that the circuit court erred in deciding that Mr. D'Antonio was Ms. Kelly's employer. As a threshold matter, they argue that the circuit court only made that determination after the Agreement, which purported to release Appellants from all

27

liability relating to Ms. Kelly's unpaid wages claims. Appellants claim the circuit court never made an independent determination that Mr. D'Antonio could be liable under the MWPCL. Further, they contend that the circuit court did not have a sufficient record to find Mr. D'Antonio as Ms. Kelly's employer under Maryland's economic reality test.

Ms. Kelly also claims that the issue is not ripe; her argument, however, is that the denial of an employment relationship is an affirmative defense and is waived if not disputed in the initial answer. Notwithstanding, Ms. Kelly further maintains that the circuit court's application of the economic reality test should be upheld on appeal.

## A. Affirmative Defense

Ms. Kelly argues that Mr. D'Antonio is precluded from denying his status as Ms. Kelly's employer because such denial is an affirmative defense. Mr. D'Antonio filed a general denial under Rule 2-323(d) and did not deny this employment relationship until the Second Amended Answer. Therefore, Ms. Kelly argues, Mr. D'Antonio waived this defense and it is not preserved on appeal. We disagree.

Maryland Rule 2-323(a) states, in part: "Every defense of law or fact to a claim for relief in a complaint, counterclaim, cross-claim, or third-party claim shall be asserted in an answer, except as provided by Rule 2-322." Section (g) enumerates 20 affirmative defenses:

> [A] party shall set forth by separate defenses: (1) accord and satisfaction, (2) merger of a claim by arbitration into an award, (3) assumption of risk, (4) collateral estoppel as a defense to a claim, (5) contributory negligence, (6) duress, (7) estoppel, (8) fraud, (9) illegality, (10) laches, (11) payment, (12) release, (13) res judicata, (14) statute of frauds, (15) statute of limitations, (16) ultra vires, (17) usury, (18) waiver, (19) privilege, and (20) total or partial charitable immunity.

28

In addition, a party may include by separate defense any other matter constituting an avoidance or affirmative defense on legal or equitable grounds.

In accordance with a plain reading of this Rule, the Court of Appeals has ruled that this list of affirmative defenses is exhaustive. *Ben Lewis Plumbing, Heating & Air Conditioning, Inc. v. Liberty Mut. Ins. Co.*, 354 Md. 452, 463-65 (1999). In *Lewis*, Liberty sued for payment on the balance due for premiums on an insurance policy. *Id.* at 453. Lewis did not assert negligent misrepresentation in its Answer, but instead asserted it later and succeeded on it at trial. *Id.* at 460-62. On appeal of the issue whether Lewis had to plead negligent misrepresentation as an affirmative defense, the Court determined that Section (g) of Rule 2-323 allows for—but does not require—a separate pleading for defenses not specifically enumerated. *Id.* at 464-65. The Court noted that Section (g)'s permissive language contradicts Section (a)'s requirements;[8] however, because the breach of contract claim was for money damages only, the Court found that Section (d) governed the action.[9] *Id.* at 466-67. That section allows for general denial pleas in certain actions if the party is not asserting one of the defenses in Section (g). *Id.* The Court therefore reasoned that, because negligent misrepresentation is not enumerated in Section (g), Lewis

---

[8] Section (a) reads, in part, "**(a) Content.** A claim for relief is brought to issue by filing an answer. Every defense of law or fact to a claim for relief in a complaint, counterclaim, cross-claim, or third-party claim shall be asserted in an answer, except as provided by Rule 2-322." Md. Rule 2-323(a).

[9] Section (d) states, "**(d) General Denials in Specified Causes.** When the action in any count is for breach of contract, debt, or tort and the claim for relief is for money only, a party may answer that count by a general denial of liability." Md. Rule 2-323(d).

had not waived that defense by failing to plead it in its Answer. *Id.* at 467.

The same result is warranted here. Ms. Kelly's first two claims are under the MWHL and the MWPCL for failing to pay overtime wages calculated from her hourly rate and pay periods. Courts have struggled to determine whether a MWPCL claim sounds in tort or in contract. *See Cunningham v. Feinberg*, 441 Md. 310, 324-25 (2015) (explaining that federal district courts, in trying to apply the correct choice of law doctrines, had difficulty in determining the underlying nature of a MWPCL claim). As both breach of contract and torts claims are included in the provisions of Section (d), we do not resolve that issue here. Ms. Kelly's third claim, quantum meruit, asserts a breach of contract claim—that Appellants had a contractual obligation to pay her regular and overtime wages and failed to do so. The only relief sought, absent a general catch-all provision, is for money. Hence, as in *Lewis*, we are operating within the purview of Section (d). *See Lewis*, 354 Md. at 466.

Applying *Lewis*, we hold that Mr. D'Antonio waived only those defenses enumerated in Section (g) that he did not assert in his answer. Denial of an employer-employee relationship is not one of the affirmative defenses enumerated in Section (g). *See* Md. Rule 2-323(g).[10] By including a general denial of liability, Mr. D'Antonio preserved

---

[10] More fundamentally, affirmative defenses involve the concept of confession and avoidance—whereby a defendant assumes that the allegations in the complaint entitle the plaintiff to relief, but asserts a superseding legal basis to avoid liability, such as a discharge in bankruptcy. *See Armstrong v. Johnson Motor Lines, Inc.*, 12 Md. App. 492, 500-01 (1971) (in rejecting the argument that defendant's claimed existence of a sudden emergency was an affirmative defense, this Court instructed, "An affirmative defense is one which directly or implicitly concedes the basic position of the opposing party, but which asserts that notwithstanding that concession the opponent is not entitled to prevail

all other defenses, including the ability to deny an employment relationship. He could have—but was not required to—plead that defense separately.

## B. Economic Reality Test

Appellants next contend that the circuit court erred in finding Mr. D'Antonio personally liable for Ms. Kelly's attorneys' fees because it only found that he could be liable *after* the parties settled. Appellants then challenge the circuit court's factual findings that supported its legal conclusion that Mr. D'Antonio was an "employer" under the MWPCL.

On appeal of a non-jury action, we review the trial court's legal conclusions *de novo* and its evidentiary findings for clear error. Md. Rule 8-131(c); *Cunningham*, 441 Md. at 322. The determination of whether a defendant qualifies as an employer presents a mixed question of law and fact. Although the ultimate conclusion is a question of law on which we grant the circuit court no deference, the analysis includes several factual determinations on which we must defer to the circuit court's findings unless clearly erroneous.

LE § 3-507.2(b) states, "If . . . a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as the result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." The question of whether a defendant is an 'employer' under LE § 3-507.2(b) is, therefore, "a condition precedent to an action for treble damages,

because he is precluded for some other reason."). Here, Mr. D'Antonio is not asserting that he has some defense pursuant to which he may avoid liability even if Ms. Kelly is otherwise entitled to prevail.

31

attorney's fees, and litigation costs under the statute, we must first consider whether the [defendant] could be subjected to such liability." *Pinsky v. Pikesville Recreation Council*, 214 Md. App. 550, 588 (2013). Thus, the court was correct in analyzing whether Mr. D'Antonio was indeed an employer of Ms. Kelly before granting an award of attorneys' fees.

The MWPCL defines "employer" broadly to encompass "any person who employs an individual in the State or a successor of the person." *See* LE § 3-501(b); *Campusano v. Lusitano Const. LLC*, 208 Md. App. 29, 38 (2012). While not defining employee, the MWPCL does define "employ" as "to engage an individual to work," which includes "allowing an individual to work" and "instructing an individual to be present at a work site." LE § 3-101(c). Critical to the determination of whether an individual is an employer is whether the individual has the right "to control and direct the employee in the performance of the work and in the manner in which the work is to be done." *Auto. Trade Ass'n v. Harold Folk Enters, Inc.*, 301 Md. 642, 660 (1984).

In *Campusano*, we extended the economic reality test applied to employer determinations under the MWHL to the employer determinations under the MWPCL because of the similarities between the Acts' definitions. 208 Md. App. at 37-39. That test uses four factors to determine an individual's level of "control" over an employee.[11] The factors are "not to be applied mechanistically, and their general purpose must be

---

[11] As in *Newell v. Runnels*, we do not apply another test that includes six factors and is only applicable where "the alleged employer receives the fruits of the employees' labor in a borrowed servant context." *See* 407 Md. 578, 653 n.39 (2009). There is no claim of such employment in this case.

32

understood as ultimately assigning *responsibility* under the law." *Id.* at 40 (emphasis in original). The determination of "control" thus considers "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* at 39-40 (quoting *Newell v. Runnels*, 407 Md. 578, 651 (2009)) (additional citation omitted).

In *Campusano*, four individuals claimed that a construction company, its owner, and a supervisor violated the MWPCL and the Fair Labor Standards Act of 1938 ("FLSA"). *Id.* at 32-35. After a bench trial, the court found the owner and company liable as "employers" for unpaid wages but determined that the supervisor was not an "employer". *Id.* at 35. We considered the economic reality of the supervisor's situation on appeal and upheld the trial court's determination. *Id.* at 40-41. The supervisor's tasks—like controlling work schedules and working conditions and maintaining work logs—were not sufficient to garner personal liability, "particularly where he had no ownership control, or investment in the LLC that was appellants' formal employer." *Id.* at 40.

Mr. D'Antonio is correct that his position as sole owner of Pinnacle does not alone subject him to personal liability under the MWPCL. His further argument that whether "an individual corporate officer in fact <u>exercised</u> the powers which influenced the decision" controls the determination of whether he is an employer, however, is misplaced. Other indicators include the individual's operational control and the individual's ownership interest. *Id.* (citing *Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). Indeed, "'it is the totality of the circumstances, and not any one factor, which

33

determines whether a worker is the employee of a particular alleged employer.'" *Id.* (quoting *Baystate*, 163 F.3d at 676).

We discern no error in the circuit court's application of the four-factor economic reality test in this case, and uphold the court's determination that Mr. D'Antonio is Ms. Kelly's employer. Starting with the first factor—that the individual has the power to hire and to fire—the circuit court observed that Mr. D'Antonio stated in his answers to Ms. Kelly's interrogatories that he "is the only person at the Pinnacle Group, LLC with the authority to 'officially hire' or 'officially fire' its employees." We considered a nearly identical finding in *Campusano*. *See* 208 Md. App. at 40-41 ("First, the trial court found that [the owner], not [the supervisor] had the power to hire and fire employees[.]"). Mr. D'Antonio's argument that he has two full-time office employees who largely deal with the "hiring and firing of companion care employees for Life Matters (i.e. Pinnacle)" is unpersuasive. The first factor focuses on who has the *capacity* to hire or fire someone. Here, Mr. D'Antonio admits to having two employees who essentially run LifeMatters, ostensibly to point out that he did not actually *exercise* that power. That distinction is inapplicable here.

Moving on to the second factor—supervision and control of schedules and working conditions—Mr. D'Antonio's own admissions, again, support a finding against him. In his interrogatory answers, he responded that he "'has the final say regarding employees' work schedules;'" "'supervised [Ms. Kelly]' in his capacity as 'Owner of the Company';" and "'has final authority to oversee the daily operations' of the business." The circuit court further noted that Mr. D'Antonio would personally call individuals if he needed someone

34

to cover a shift. Again, Mr. D'Antonio's reliance on having two employees "who are responsible for bookkeeping, payroll, scheduling employees, and administering other personnel related duties" does not preclude him from having overall authority and liability. As in *Campusano*, where the supervisor controlled work schedules and working conditions, Mr. D'Antonio's delegation of such supervisory tasks is insufficient to shed his legal liability. *See id.* at 40. We reiterate here that granting supervisory authority to others does not absolve Appellant of the benefits and drawbacks of his position.

Mr. D'Antonio does not raise any arguments to counter the circuit court's finding of the third and fourth factors—method and rate of payment, and the maintenance of employment records—and we determine that these factors also support the conclusion that he was Ms. Kelly's employer. In regard to determining employees' rate and method of payment, Mr. D'Antonio stated in his deposition that he must approve a summary of each employee's hours "before each payroll process is finalized[.]" The circuit court found that the evidence demonstrated that he has "total control" over the rate and method of payment; he is "'responsible for authorizing and directing compensation to all employees;' [approves] '[a]ll salary and pay raises[;]'" and "'is the only person with authority to determine employees' rates of pay, pay dates, etc.'" As for the final factor—maintenance of employment records— Mr. D'Antonio responded in his answers to interrogatories that he "'has final authority to oversee the daily operations'" of the business. We agree with the circuit court that this would include the authority to maintain employment records. Given the strength of the findings on the first three factors, and that this factor also tends to show that Mr. D'Antonio was Ms. Kelly's employer, application of the economic reality

test leads us to the inevitable conclusion that, based on "'the totality of the circumstances, and not any one factor,'" Ms. Kelly was the employee of Mr. D'Antonio. *See Campusano*, 208 Md. App. at 40 (citation omitted). Mr. D'Antonio is therefore jointly and severally liable for any judgment against Appellants.

## VI.

## AWARD OF ATTORNEYS' FEES

### A. Decision to Award

Appellants next assert that Ms. Kelly failed to establish that her attorneys' fees were necessary to satisfy her claims. As a result, they believe an award of such fees would act only as a penalty and would contravene *Ocean City, Md., Chamber of Commerce, Inc. v. Barufaldi*, 434 Md. 381, 398 (2013) ("*Barufaldi III*"), in which, they contend, the Court of Appeals instructed courts that "the focus is not on whether the defendant is penalized by the award, but whether the harm to the *plaintiff* is remedied." *Id.* (emphasis in original).

Ms. Kelly also relies on *Barufaldi III*. She does so for the proposition that the MWPCL encourages employees to have competent counsel in what is likely a small claim. *Id.* at 393. Further, Ms. Kelly asserts that the MWPCL authorizes a trial court to "exercise [its] discretion liberally in favor of awarding a reasonable fee," unless there is misconduct sufficient to contravene the statutory purpose. *Id.* at 385.

We review a trial court's decision to award attorneys' fees and costs for abuse of discretion. *Barufaldi I,* 196 Md. App. at 35-36. A trial court abuses that discretion when it disregards established principles or adopts a position that no reasonable person would accept. *Letke Sec. Contractors, Inc. v. U.S. Sur. Co.*, 191 Md. App. 462, 474 (2010).

36

"Maryland generally adheres to the common law, or American rule, that each party to a case is responsible for the fees of its own attorneys, regardless of the outcome." *Friolo v. Frankel,* 403 Md. 443, 456 (2008) ("*Friolo III*"). An exception to this rule exists when the legislature has included a fee-shifting provision that may obligate a party to pay the opponent's attorneys' fees. *Id.* Maryland Rule 2-703(f) directs circuit courts to consider twelve factors ("the *Johnson* factors") when a law permits them to award attorneys' fees:

(A) the time and labor required;
(B) the novelty and difficulty of the questions;
(C) the skill required to perform the legal service properly;
(D) whether acceptance of the case precluded other employment by the attorney;
(E) the customary fee for similar legal services;
(F) whether the fee is fixed or contingent;
(G) any time limitations imposed by the client or the circumstances;
(H) the amount involved and the results obtained;
(I) the experience, reputation, and ability of the attorneys;
(J) the undesirability of the case;
(K) the nature and length of the professional relationship with the client; and
(L) awards in similar cases.

Md. Rule 2-703(f)(2)-(3); *see also* Md. Rule 3-741(e)(2)(A) (directing the district court to consider the same factors when determining an award of attorneys' fees); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (iterating these factors). The Court of Appeals has approved the use of these factors in cases where the lodestar method is generally appropriate.[12] *See Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333-34 (2010); Committee Note to Maryland Rule 2-703(f)(3).

---

[12] The lodestar method, adopted from the federal court system, calculates attorneys' fees as the product of reasonable hours times a reasonable rate. *Friolo I*, 373 Md. at 519, 529.

The MWPCL's primary aim is to provide "a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Medex v. McCabe*, 372 Md. 28, 39 (2002). To effectuate that purpose, the legislature included a fee-shifting provision so private attorneys would have an incentive to represent parties with small claims. *Barufaldi III*, 434 Md. at 392. In MWPCL cases, the Court of Appeals has approved the lodestar method, considered in light of the *Johnson* factors, as the presumptively appropriate method for determining whether to award attorneys' fees. *Friolo v. Frankel*, 373 Md. 501, 529 (2003) ("*Friolo I*"). Courts should liberally exercise their discretion in favor of an award "unless the circumstances of the particular case indicate some good reason why a fee award is inappropriate in that case." *Id.* at 518.

Here, the circuit court conducted a full examination of the relevant factors in its lodestar analysis, finding that this case required a great deal of work, research, and writing in a range of courts in our judicial system and that the issue of a bona fide dispute was a "novel and difficult question" of first impression requiring significant research and discovery. The court then considered the adroitness of Ms. Kelly's attorneys, noting their success in their arguments and overall victory for their client, and that as attorneys who work for The Public Justice Center and the Maryland Legal Aid Bureau, they have limited resources and, in pursuing this extensive litigation, they were forced to deny representation to others.

The court, in its analysis, then compared Ms. Kelly's alleged fees to customary rates for attorneys on our Lower Eastern Shore, agreeing with Appellants to adopt the rate for that region as opposed to Ms. Kelly's request based on statewide customary rates, and

38

found the fact that such fees were expected to be paid by a fee petition had only neutral effect. It subsequently performed an extensive look at the amount in controversy and results obtained, concluding that it "weigh[ed] most heavily in favor of" Ms. Kelly. The court also noted that as Ms. Kelly's attorneys "have extensive experience, are highly reputable in the legal community and have tremendous legal ability[,]" that factor also favored Ms. Kelly. Likewise, in support of Ms. Kelly, the court determined that many attorneys would consider this an undesirable case, especially as, at the time of filing, the MWPCL allegedly did not contain an action for unpaid overtime wages. Finally, because Ms. Kelly had failed to provide any evidence of awards from similar cases on the Lower Eastern Shore, the last factor disfavored Ms. Kelly.

Given the circuit court's in-depth application of the twelve *Johnson* factors in its lodestar analysis and in light of the MWPCL's purpose to incentivize attorneys, we cannot hold that it abused its discretion in awarding attorneys' fees to Ms. Kelly. In our view, the circuit court considered the relevant factors as required, weighed them appropriately, and made a decision. We do not believe the result is such that no reasonable person would be able to adopt this view, and therefore, we will not disturb the circuit court's finding that attorneys' fees were warranted.

### B. Calculation of Attorneys' Fees

In her cross-appeal, Ms. Kelly challenges the circuit court's determination of the amount of attorneys' fees it awarded. She contends that the court incorrectly applied a "proportionality" analysis based on the size of the damages award rather than a "degree of success" analysis. Ms. Kelly explains that the court should have applied the *Johnson*

39

factors when determining the award *amount*. She also argues that the court impermissibly created and applied a requirement to notify opposing counsel of fee rates. As a result, Ms. Kelly claims that the circuit court abused its discretion by arbitrarily failing to award fees for over 400 hours of work out of the 598.7 sought and did not address the issue of costs, which were $2,851.40.

Appellants respond that the court did not abuse its discretion by denying Ms. Kelly's request for attorneys' fees and costs under the MWHL. They continue that the circuit court "took care in applying the lodestar methodology[,]" rejecting Ms. Kelly's requested fees because it would constitute a windfall and because Ms. Kelly's attorneys did not adequately disclose the amount of work being done on the case.

In addition to their discretion in deciding whether to award attorneys' fees, trial courts have discretion in determining how much to award in attorneys' fees for an MWPCL claim. *Frankel v. Friolo*, 170 Md. App. 441, 448 (2006) ("*Friolo II*"). That discretion "is to be exercised liberally in favor of allowing a fee" because the "provisions for counsel fees in [LE § 3-427(d) and LE § 3-507.1(b)][13] are remedial in nature[.]" *Friolo I*, 373 Md. at 512, 517. In conformance with the predominant rule throughout the country, the *Friolo I* Court ruled that "the lodestar approach, with its adjustments, is the presumptively appropriate methodology to be used under the [MWPCL]." *Friolo I*, 373 Md. at 529. The

---

[13] In 1993, after the legislature's amendments, the Governor signed House Bill 1006, which permitted direct action by an employee against an employer for unpaid wages under the MWPCL. 1993 Md. Laws, ch. 578; *see also Friolo I*, 373 Md. at 516-17. What was formerly LE § 3-507.1 became LE § 3-507.2 in 2010. 2010 Md. Laws ch. 151 § 1.

40

Court further noted that "the adjustments, up or down, may well produce a result that, in the end, has little relationship to the actual time spent on the case" and that adjustments[14] are "largely case-specific[.]" *Id.* at 529. The Court later observed that, when, apart from money, "the plaintiff achieves other form of significant relief—or even voluntary behavior modification on the part of the defendant as a result of the lawsuit—the court must look beyond just the correlation between time spent on the case as a whole and any monetary relief." *Friolo v. Frankel,* 438 Md. 304, 322-23 ("*Friolo IV*").

Given the need for specificity, "it is necessarily incumbent upon the trial judge to give a *clear explanation of the factors* he or she employed in arriving at the end result." *Friolo II*, 170 Md. App. at 449 (citing *Friolo I*, 373 Md. at 505; emphasis in *Friolo II*). Therefore, a trial court must clearly articulate the factors and reasoning used to calculate the overall figure so that an appellate court can adequately discern the soundness of the trial court's conclusion. *Id.* at 450-51 (citing *Friolo I*, 373 Md. at 529). When the trial court's decision "'does not support a conclusion that [it] *actually used* that approach, there would be an error of law.'" *Id.* at 448 (quoting *Friolo I*, 373 Md. at 512; emphasis in *Friolo II*). Upon finding an error of law, we will remand for further proceedings to detail the calculation of attorneys' fees. *Friolo I*, 373 Md. at 512.

---

[14] The Court instructed that "[i]n focusing on the lodestar approach, or indeed any other, we must be mindful of Rule 1.5 of the Maryland Rules of Professional Conduct, which also requires that a lawyer's fee be reasonable and which sets out factors to be considered in determining the reasonableness of a fee. Most of them are identical or similar to the factors enumerated in *Johnson v. Georgia Highway Express, supra,* 488 F.2d 714, which the *Hensley* [*v. Eckerhart*, 461 U.S. 424 (1983)] Court indicated were relevant even in a lodestar analysis." *Friolo I*, 373 Md. at 527.

The culmination of the lengthy *Friolo* litigation—"the judicial equivalent of the perfect storm"—guides our review. *Friolo IV,* 438 Md. at 319. At the outset, the issue before the Court of Appeals in *Friolo I* was whether, after entering judgment for the employee on her MWHL and MWPCL claims, the lower court was required to use the lodestar approach in calculating "reasonable counsel fees[.]" *Friolo I,* 373 Md. at 505 (quoting LE § 3-427(d)(1), § 3-507.1(b)). The Court of Appeals held that the trial court did not give a clear explanation of the factors that it "employed in arriving at the end result[,]" and following detailed instructions on how to employ the lodestar factors and any applicable adjustments, the Court remanded the case for "a further proceeding and a better explanation." *Id.* at 505, 529-530. Unfortunately, remand did not quell the storm. After several appeals, remands, and a reconsideration on exceptions, the trial court ultimately awarded $5,000 out of nearly $400,000 claimed in attorneys' fees—and that $5,000 award did not include appellate fees. *Friolo IV,* 438 Md. at 310-17. Although the Court of Appeals in *Friolo IV* held that the circuit court abused its discretion in failing to award any attorneys' fees for appellate work, it articulated several reasons for upholding the amount of attorneys' fees the trial court awarded for trial and immediate post-trial work:

> 1) [Trial court]'s conclusion that the $6,841 part of the $11,778 judgment for non-payment of bonuses was not subject to fee-shifting was correct, and, although that does not necessarily require a 58 percent pro rata reduction in the fee request, the pro rata reduction does not constitute an abuse of discretion. The claim for bonuses was not allied to the $4,937 claim for overtime, which was under a different statute and rested on different evidence.
>
> (2) [Trial court]'s use of the hourly rates provided for in the retainer agreement between the parties, rather than the hourly rates stipulated by the parties, was not an abuse of discretion. It is for the court to determine what

42

hourly rates are reasonable, and, although [it] could have accepted the rates agreed to by the parties, [it] was not required to do so.

(3) [Trial court]'s determination as to the reasonable number of hours necessary to complete the trial and immediate post-trial stage does not amount to an abuse of his discretion. [It] explained in great detail why [it] believed various blocks of hours spent on various tasks were unnecessary or excessive. Accordingly, [its] allowance of $5,000 for trial and immediate post-trial work was not an abuse of discretion. It is consistent with the $4,711 awarded . . . in the first go-round, which we noted was not unreasonable in amount.

(4) [Trial court]'s direction that the master's fees be split equally between the parties was not an abuse of discretion.

(5) [Trial court]'s allowance of nothing for any of the appellate work does amount to an abuse of discretion, for the following reasons:

(a) With respect to the first appeal, [employee] did, in fact, prevail. [Counsel] convinced this Court that the modified lodestar approach was the proper one to apply and that [trial court] apparently failed to apply that approach. The judgment as to fees was vacated and the case was remanded for the trial court to apply the proper test, with costs of the appeal to be paid by [employer]. Although [employer] asserts that [employee]'s real objective was to get an increase in the fees and not really to establish a new principle of law, the facts are that (i) through [counsel]'s efforts an important precedent was set, and (ii) on remand, he was awarded a fee of $65,348—considerably more than the $4,711 he had been awarded initially. The problem was that it was unclear whether that fee included any appellate time.

*Id.* at 327-28 (footnote omitted).

Returning to the case on appeal, the circuit court explained, in great detail, several reasons why it determined that Ms. Kelly's request for $146,987.66 in attorneys' fees was not reasonable. The circuit court looked at Ms. Kelly's success, including her "relatively modest" award and that the Appellants' course of conduct changed early in the litigation,

43

deciding that a lesser amount would thus provide a reasonable deterrent to future conduct. It also looked at the lack of disclosure for fee rates for nine of the eleven attorneys who worked on Ms. Kelly's case until late in the litigation and chose to award the higher rate of the two initially disclosed. As in *Friolo IV*, this is within the trial court's purview because "it is for the court to determine what hourly rates are reasonable," 438 Md. at 327, and we will not disturb its decision.

In contrast with the Court of Appeals' review in *Friolo IV*, however, we cannot find that the circuit court "explained in great detail" its findings on why certain "blocks of hours . . . were unnecessary or excessive." *See id.* Here, the circuit court only indicated the 197 hours for which it would be awarding fees, but it did not address why it did not award fees for the roughly 400 other hours for which Ms. Kelly sought compensation. Although, as stated *supra*, the court did explain that it was not awarding attorneys' fees for the MWHL claim and the district court action, it is not clear from the record how many hours were subtracted from the approximately 400 remaining hours in the fee petition for this. The court also did not explain why other blocks of time were excluded: for example, why it did not award attorneys' fees for the significant amount of time incurred preparing for and taking depositions. As Ms. Kelly points out, it was through this discovery that she was able to establish that Mr. D'Antonio "honestly never looked into" his obligation to pay overtime. Although we review for abuse of discretion, the trial court must explain its reasoning for its determinations so that we can ascertain the validity of its decision on review. *See* 438 Md. at 327-28. We hold that the circuit court abused its discretion only insofar as it did not articulate the reasoning behind why it chose to not award attorneys'

44

fees for approximately 400 hours. *See Friolo IV*, 438 Md. at 327 (noting that the trial court properly "explained in great detail why he believed various blocks of hours spent on various tasks were unnecessary or excessive.").

> **JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED, EXCEPT WITH RESPECT TO THE AMOUNT OF ATTORNEYS' FEES AWARD; CASE REMANDED FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS.**